136085 William Eugene Thompson v. Philip W. Parker Warden Arguments not to exceed 30 minutes per side. Mr. Burke for appellant. Good afternoon. My name is Dennis Burke and along with Krista Dolan we represent William Thompson. I would like to, well first of all I'm reserving five minutes for rebuttal if I could. You may. Thank you. I would like to address two issues here this afternoon. The first regarding the discussion and very likely consideration of information that was brought in from outside the jury room that was not introduced at trial so that Mr. Thompson had an opportunity to address it. That had a direct bearing upon the jury's deliberations while they were in the penalty deliberations and while they were deadlocked. And secondly I would like to address the state court's application of Mills v. Maryland to the penalty phase jury instructions. Regarding the extraneous information that was considered or that was discussed by the jury, during the jury deliberations I think it's important to sort of set the stage here a little bit. The jury had begun deliberating at approximately 11 a.m. and at 5 p.m. they reported to the court that they were still far apart and were deadlocked. And then they returned a verdict at approximately 8.30. The foreman of that jury testified that while the jury was deadlocked there was discussion of a story that had been prominent in the media that a news article that one of the jurors had raised during the deliberations regarding a man in Florida who had been in prison much like Mr. Thompson had been released from prison and then at the age of 70 murdered someone. Now the reason why that was particularly significant for this particular jury is that in Kentucky at that time there was no life without possibility of parole. So the jury for all intents and purposes was deciding whether or not to sentence Mr. Thompson to death or... That's why he could get 20 years, 50 years or life, was it something like that? But that life would have still meant he could have gotten parole after XTX years. Right. So it's 20 to 50 or life or life without for 25. Just to be clear, when you say it was in the news, there's no indication that any physical object was brought into the room. There was not a newspaper clipping brought into the room. That's correct. The information was discussed. That's... If I've read the transcript. That is correct. Somebody said something and then something else happened. Right. So there was no newspaper that was actually in the jury room. But as we know that it doesn't need to have actually been in the jury room for it to be considered extraneous information. And so in this case it was a news story that had direct bearing on the jury's deliberations. Like I said, the reason why it had... Indirect bearing might be a little better as far as... Because, you know, I'll put it to you. My question here is completely independent of this particular case, jurors could certainly have said, oh, come on, Fred, somebody could get out at 70 and still kill people, right? I mean, we know there are murderers that are that old. Sure. Nothing wrong with that, right? Is there anything wrong with that? There isn't anything wrong with that. Okay, so the only thing that's wrong is they said, and I think I heard a case about Florida where it actually happened. Is that the only thing that's wrong here? Well... That I actually heard that there was a case in Florida where... No, what was discussed is that this was a case that was ongoing. In fact, the trial started the following week. So this was the circumstances where this story had been in the news because it was apparently the first time the man from Florida had chopped off the arms of the first victim. So this is a case that had gotten, you know, quite a bit of press. And there was a discussion about this news story about, you know, so about this man in Florida who's about to stand trial in circumstances not unlike the circumstances... In fact, he hadn't even been convicted of this... Of this, right, of the... Second crime, because the first one was murdered. Correct. But... Would it have been any different if he said, gee, you know, we all know that Whitey Bulger, the famous gangster, was still killing people when he was 75. Would that be okay? Well, I think that would depend, Your Honor. If, in fact, the discussion was, well, we were reading, one of the jurors said, I read a newspaper article about Billy Bulger who committed a, and we don't know that he was still committing crimes. Whitey. I'm sorry. Billy is his brother who's the President of the State Senate. Billy's his brother. So that Whitey Bulger, if, in fact, the juror had brought in or talked about reading this article about Whitey Bulger killing someone at the age of 70, then I think that, too, would have represented extraneous information. Read a book about somebody who killed people 40 years ago when he was over 70? If the... Very notorious. You're referring to Whitey Bulger? Well, or, you know, any other famous elderly gangster. Well, I... There are many. Sure. I think that if that book, if they used the information from that book to then discuss and then consider whether or not they were going to sentence Mr. Thompson to death based on that information, then I think the answer is yes, that would be extraneous. Okay. So are you specifying that it needs to be a particular person and a particularly notorious person? As opposed to, because you seem to sort of be okay with my first statement. No, I think what it comes down to is whether or not, in this particular case, the circumstances were whether or not this, I mean, this man was prominent in the news so they were talking about him, but if, in this case, a person who was violent who was going to be eligible for parole at the age of approximately 70, in this case it was somewhere between 70 and 75, the jury had to decide whether or not this man was a threat. And the problem with what the jury considered is that it contradicted the information or the evidence that had been presented at trial, or it certainly undermined the evidence that was presented at trial, and Mr. Thompson had no means... The evidence at trial was what, that when he was 70 he would never kill anybody or just that as you get older you're less likely to kill people? That's really the problem for me is if you're just saying that on both sides it's common probability knowledge that is, yes, people who are over 70 kill less often than people who are 25. And conversely, it's not a null set. People who are over 70 sometimes kill people. So you've simply got those two considerations and this particular instance at least one person said, here's an example. Okay, but that wasn't the evidence that was presented at trial, though. What was the evidence? So the evidence at trial was that, well, first of all, of course, there were the aggravators, which were he had committed, I mean, the crime itself, and then he had committed another murder. But the mitigating evidence that was presented, aside from the fact that his father had abandoned him and things like that, was that he had been diagnosed by the prison psychiatrist with a developmental personality disorder that she determined was both genetic or caused by genetics and had environmental causes. But importantly for our purposes, what she also said is that this personality disorder, which resulted in him having poor violent impulse control, that he would age out of that. It would start at the age of 40 and he would age out of that. And so for purposes of consideration of the jury, she said he would age out so that he couldn't kill anybody? He would begin to age out. No, that his inability to control his impulses or the actual violent impulses would diminish, beginning at his fourth decade, she testified, and then onward. Okay, but the Florida case didn't have anything to do with poor impulse control, did it? I mean, in other words, if the gravamen of that other case was, hey, and this guy has the same kind of cockamamie psychiatric argument that our guy does, then I think you would be in much better shape. But I think that's exactly it. Because the jury didn't, because this wasn't introduced at trial, the jury only heard this information about a man at the age of 70 who killed somebody else. So Mr. Thompson didn't have the opportunity to, and of course, I don't think it would have, it certainly wouldn't have come in through this juror, but through, say, another psychiatrist for the Commonwealth, to be able to distinguish the difference between Mr. Thompson's personality disorder and whatever was wrong with the man from Florida, if there was something wrong, if it wasn't just that he was a mean and vicious person. But that's the problem, is that Mr. Thompson didn't have an opportunity to explain that to the jury. And under the circumstances where they were deadlocked, where the only choice really was between the possibility of being released at 75 and a death sentence, the likelihood that they considered that information, because we know they were discussing it, the likelihood that they considered it. I mean, this jury's testimony, which as I read it, is kind of all over the lot in terms of how many people were talking about it and whether they were at one end of the table and maybe during eating, and it's sort of, you know, there's nothing about, well, Bill said this and then Sally chimed in that that's good information and that kind of thing. Right, and of course, that's because, you know, at least a part of the trial was in 1998, and he testified in 2012. So a great deal of time had gone by. But he didn't, he was, he never backed away from the fact that there was a discussion amongst the jurors about this story, about the man from, the news story about the man from Florida. In fact, when he talked about it, he was asked about that discussion, whether he had considered other things. He actually said, yes, you know, we discussed that and not, had you discussed other things?  So based on Mr. Dowdy's testimony, it certainly appears that the jury was discussing this news story after they, while they were deadlocked, in the context of this other evidence that they were, that actually was introduced. That's the way you read that statement as opposed to just, you know, we discussed lots of things, they sent us a whole box of evidence. You're trying to read that as saying that the box of evidence was about his propensity? I think the box of evidence, I think they were referring to the evidence that was introduced at trial, whatever. All the evidence, not just the evidence about. Right, correct, correct. Okay, go ahead. I can look it up, but that was, go ahead. Sure, and I think along with that, so they considered, they were considering that all of the evidence from trial, they were unable to reach a decision. Then they were discussing this news story about this man who killed someone at the age of 70, and shortly thereafter, they reached a verdict of a, or came down with a death sentence. Where did you get the timing from? From the transcript. I can't tell you when they actually started, when the news article was brought up, but I know it was while they were deadlocked because he testified to that, and they were deadlocked from approximately 5 o'clock until 8.30. So it was sometime during that stretch that they were discussing it. This is where he says, this is on page ID 277. After it was brought up by the jurors, was there some discussion about it from some of the jurors? I don't have a clue right now. It may have been, I just don't know. And he goes there several times about I don't have a clue, but he does say that they could have been talking about it. That's why I was kind of reluctant about the relationship to the box of evidence. I hadn't quite found that yet, but the part that I just read is when they were specifically asked, was there some discussion about that from some of the jurors? That's the bottom of 277, top of 278. It was probably brought up sometime during the period when it was 9 to 3, 8 to 4, so that supports you as to the timing. But as to how much discussion there was, that was where I found it. There's a lot of I don't have a clue in that portion. But go ahead with your, wherever you wish to take it. What makes it extraneous evidence or material? Where do you draw the line between general knowledge and experience and something that undermines the jury's verdict? Is it because it's specific? Yes, Your Honor. We know that it wasn't any sort of a life experience that the juror was talking about. It was while this news story was going on. But we read things. If somebody says, I once read about a guy who... Well, I think the difference, though, between that and this news story is that the reason why, for example, we don't want jurors to be reading news stories about the actual crime that is being, or the defendant who's being prosecuted is because jurors are likely to put some credibility into those news stories as opposed to, I know someone who knows someone who heard about a guy who killed someone. No, it's because it's the facts of the event. That when you decide what happened, it has to be evidence that's introduced at the trial. So that's why they can't read about that event or speak to people about the event. Because they may get information about the event. But we know that if there's someone who is approaching the, who's at prior to jury, I'm sorry, a trial, who was aware of the facts, who had heard someone talking about it, that that does not exclude them from being jurors because they are still able to consider, if they can, the evidence and be impartial jurors. In this case, we don't know whether the jurors were able to do that because Mr. Thompson didn't have any means of fleshing that out. He had no means of, so unbeknownst to him, not unlike Graham v. Florida where this was with the judge who was considering stuff that the defendant didn't have an opportunity to address or to contest. Here, Mr. Thompson had no opportunity to do that. He had no opportunity to differentiate between the man in Florida and the man in Kentucky, in this case, William Thompson. But to take another example, suppose the witnesses, some of it's about how good was the eyewitness, how much light it was, and the guy says, the witness says, well, gee, I mean, it was only 830 in the morning. It was still pretty dark in July. And these farmers are sitting around and say, you know, I know it's not dark at 830 in July. Can they not say that? I mean, that's life experience. Maybe they read it in an almanac, maybe not, but it's extraneous in the sense that it wasn't testified to. Sure, but again, that would be a life experience or likely a life experience. Now, if that was a material... My brother told me. Okay, so if this was a really material fact, right? If it was the end-all, be-all of the case, if it was... This is not guilt-innocence penalty, but if it was, say, guilt-innocence, and it was the difference of guilt or innocence, and this juror talked about this information he had learned about sunrise being at 830 or something, or sunset being at 830 as opposed to what the evidence was, then yes, that would still be... If he was bringing that in from outside because he had learned of it from a book, or from a lecture he'd gone to or whatever... Difference between it being a book... I mean, suppose the person had happened to have been down at Mr. Singleton's arraignment, or if that's his name, whatever his arraignment... The difference is whether it's internal or external. Okay, incidentally, I found the part about the box of evidence, which is at the bottom of 281 over to 282, and that gets started by, did you all discuss anything other than this one murder in Florida? And he says, oh, sure, we discussed a lot. We brought out the evidence. We had boxes of evidence. We were there for 12 hours. We had to eat two meals. So he's not tying the box of evidence to the Florida case at all that I can see, because the question is, did you discuss anything other than that murder? Well, I think he did, because he said, is that the only thing you discussed? Oh, we discussed a lot. We brought out the evidence several times. It wasn't just the article. It wasn't just this piece here. I mean, we brought out all. We had a box of evidence in there, period. What's the reference, though? What page are you relying on for the timing? Oh, okay. It's in Volume 9 of the transcript, and I have the... It's between somewhere around 12 for the deadlock, when the judge brought them out, it was somewhere around, it was at 1284 of Volume 9, or the page number was 1284 of the transcript, and it was Volume 9. And they rendered the verdict at Volume 9, 1994, and 1995 page number. And then just before the 1284 is, I believe, when they went out for the deliberation. It was at 11 o'clock. It was all in Volume 9. That's when they discussed... It's actually part of the transcript where the court reporter observed it. But, like I said, I can't tell you when they actually, other than the fact that it was while they were deadlocked, I can't tell you when they first discussed the newspaper article. It's your time, counsel, but you might decide whether you want to talk about the Mills point. Yes, let me... Thank you, Your Honor. The Mills instruction, or the instructions... Upon reading the instructions as a whole, the jury likely applied the law in such a way that they felt they needed to find the existence of the mitigating factors unanimously. And the reason I say that is, and the instructions are laid out in the brief, but from top to bottom, the only time the jury is told what standard they're supposed to apply is the very last instruction, which is they're told that it needs to be unanimous. But more to the point, throughout that, the jury is told what to do, including they have to make findings in aggravation and mitigation, and they're told in the plural, the u-plural, you must find this. Now, for aggravation, they're told that it has to be beyond a reasonable doubt, and they're not told that on mitigation. But as far as the unanimity, there is no reference or no mention in the instructions at all, except for that one point. And like I said, the jury does have to make findings of whether or not the mitigating factors actually existed. That is in the instructions, much like they're told they have to do the same for the aggravators. So when it gets down to the... You say that they're told that they have to find, okay, whether they exist, but there's nothing on the jury form for that. There's nothing on the jury form for aggravating or mitigating factors, right? Isn't there something for aggravators? You have to list what the aggravators are. Yes, you have to list what the aggravators are. You don't have to list the mitigators. But here's what's important. So Mills talks about considering the jury instruction and the instruction, I'm sorry, the format issue. Well, the format issue here didn't talk about the mitigation, because they wouldn't have found any mitigation if they're sentencing him. They sentenced him to death. So the fact that they didn't find the mitigation... The individual juror could find any mitigators they chose and could then find that they did or did not outweigh the aggravators, right? You've got 12 jurors and there could be 0, 0, 0, 3, 5, 6... As long as each juror found that for that juror, the unanimous aggravators outweighed any mitigators. Isn't that the correct law? Well, but Kentucky's not a weighing state. So the jurors, if they find the aggravation beyond a reasonable doubt, then presumably they consider the mitigation individually, and then they can decide whether or not to sentence someone to death. It's weighing in the sense that each juror weighs his or her decision, right? Perhaps you're saying formally instructed about weighing, I'm using weighing, the jurors clearly were instructed that they could fail to sentence him to death even though they found aggravators. Is that correct? Yes, but they weren't told they could do that without finding the mitigating factors unanimously. How do these instructions differ in any respect, significant or even insignificant, from Cordenbrock? Yeah, they do. They do. Because in Cordenbrock, in fact, this is what the court based its ruling on. In Cordenbrock, the aggravator, they were told, the aggravating circumstances needed to be found unanimously, and they were not told that the mitigation needed to be found unanimously. There was no mention of it. And so the court determined that based on that, the jury was able to draw a negative inference, that in fact they wouldn't have to find the mitigation unanimously. And the same in weeks with the U.S. Supreme Court on the reasonable doubt whether or not the aggravating. You started that, but then you didn't pull the trigger on how is this different from Cordenbrock. It sounded just like it. Well, tell me what the difference is. Because the jury is not told that they need to find the aggravators. There's nothing that says that they need to find the aggravators unanimously. Nothing in this one or in Thompson? In this case, right. There's nothing here that said they had to find the aggravators unanimously? That's correct. It just says they have to do it beyond a reasonable doubt. Right. But it says that it says there's a unanimity instruction. Right. But that's not specific. Exactly. And that's the last instruction that I think a jury reasonably would presume applied to all of the instructions. It's where it belongs. It's at the end of all the instructions. And so when they're rendering their verdict, it will apply to all of them. OK, counsel, you'll have your time for rebuttal. I'm sorry. Go ahead. If you've got questions. OK. Oh, I'll ask you. Thank you. Good afternoon, your honors. Jason Moore with the Kentucky Attorney General's office for on behalf of it's actually Warden Randy White is now the warden of Kentucky State Penitentiary. But Philip Parker is still the named warden on this case. It may please the court. I'll begin with the extraneous information claim. There's actually there's three claims in this, but counsel has chosen only to address two. And so unless the court has questions for me on the proportionality issue, I will address just the two issues that my foes and counsel raised on the extraneous information. When it boils down to the if his argument is if the jury if the juror has general information that somebody can get released on parole and commit a crime. He's not saying that he's not talking about general information of what's possible. He's saying that there is a specific account of a specific person who was released at a certain age and committed a crime. That's right. But if they have just general information, that's not extraneous. But if it's something specific, there's a difference between saying this is possible and making that argument, which is general information, and specific information, which is more in line with see, here's evidence that this can happen. As opposed to something hypothetical. But as opposed to just saying that I see on the nightly news every night that someone had been released and now has been charged with a new crime. That's specific. It's not naming a specific case. Well, I think you're right. I think the issue is the age. But it's the same idea that we're considering whether or not to grant a sentence that will release this person or a sentence that's not. Every other option that the jury had allowed for consideration of parole at some point. And in their closing argument to the jury, asking for life without parole, as Judge Russell sets forth in a different claim in his opinion, defense counsel specifically argued giving parole, he'll be 75 years old before he sees the parole board. So I think it makes it certainly relevant for the jury to consider, well, I've heard of a 70 year old getting out and committing another murder. Right. And maybe your argument is helping the defendant. But there's a difference between saying I guess what he's arguing is that the more specific you get from I've heard of, which has as much value as, well, I've heard of this, I've heard of that, to this is happening right now in Florida. This is specific information. Now it starts to look more like evidence, like somebody getting on the stand and saying the fact is that 70 year olds really are violent and do these things. And it looks more like evidence or something specific that is factual and is balanced against the testimony that he's going to become more and more or less and less dangerous. Well, I have a hard time hearing a question in that. Well, the question is, what do you need? When is something extraneous information that is subject to some sort of scrutiny? Well, I think that as this court has said in Garcia, extraneous information is something that is specific knowledge about the case or the parties or their witnesses. The example came up of a case where the sun rises at 830 or something. And say there's testimony from someone that said, no, it was dark that morning at 830. And then there's no other evidence presented about that issue. And in deliberations, a juror comes in and says, you know what? I looked at the almanac last night. Sunrise on that date was 545 in the morning. So it couldn't have been dark. What about the Nevers case? The Nevers case? There was specific information about the defendants in that case, the stress information that the jurors had learned. There was also information that the jurors had learned on that case specific to what the result of a specific outcome would be and how the city was preparing for a specific outcome, that they were preparing for riots if they returned a verdict in that. But they also had the information was introduced that the defendants in that case were part of the stress unit. And that that had not come into trial. And that unit had a reputation of harassing African-American youths. And the defendant, the Nevers, had testified as to his motivation. The question there was not, did he do it? But why did he do it? And that went directly to contradict his testimony that he had given. The movie had nothing to do with it? The court certainly didn't rely on the movie, as Judge Russell said. The court, in its decision, focused primarily on the information regarding the stress information. In terms of the city preparing for a verdict, that would seem somewhat analogous to this. It has nothing to do with the facts of the case. It has to do with what's the effect of... But that's influencing the jury. The jury looks at themselves, well, if we don't come back with this verdict, the city, our city, is going to riot. So we can prevent that if we just come back with the right verdict in this case. In that instance, again, the primary focus was the information about the defendants themselves. That's what the court focused on when it granted habeas relief in that case. So your argument being that in general in a high profile trial, if jurors say, if we do this, people will riot, that's sort of common knowledge and that's at least not reversible? As opposed to, for example, a specific preparation or a specific evidence about the defendant himself? I think if it's discussion just amongst the jurors, that some of the jurors might believe that to be a possibility, that that would not be extraneous information. It's when it's coming from a third party source, the news, the media reporting in Nevers, that it becomes. But if that had been the information alone, Nevers very well could have a different result. The court certainly did not rely upon that factor in finding that there should be habeas relief. You're saying the information has to be specifically about the facts of the case? About the facts of the case or the parties or their witnesses. That's how this court defined extraneous influence in Garcia. On the jury instruction, counsel is correct. If you look at these instructions, there's talk about reasonable doubt. There's only one place where there's a reference to unanimity. It says the verdict of the jury must be in writing, must be unanimous and that's what one of you is forming. That's correct. That's the only reference. Most of the instructions refer to the jury as you, you, you, you, you, which I guess can be understood as being you as an individual juror. When you're in the mitigation instructions, and this is really the only place I see it, it says you consider these things, the mitigation or extenuating facts and circumstances have been presented to you and the evidence you believe to be true. And then it says any other circumstance or circumstances arising from the evidence, would you, the jury, deem to have mitigating value? And doesn't that sound like they're saying that the jury as a whole has to find that? It's at the top of page 1239. I don't have that page in front of me, but I think you have to read the mitigating circumstance instruction as a whole. It's the only time in the instructions where the judge says you, the jury. In the aggravating it says you shall consider the following things. In Kentucky, you can be both singular and plural. I know, but this is the only time I'm saying where there's a statement that you, the jury, which is collective. At the end, you're correct. I just want to know if you have a response to that. I mean, isn't this case, let me say, isn't this case a little different because the unanimity instruction, it doesn't say, and you have to find aggravating circumstances unanimously, right? So you can't draw the distinction that, oh, they said unanimous for aggravating, they didn't say unanimous for mitigating, therefore the only reasonable inference is blah, blah, blah. I mean, you don't have that dichotomy in this case. Well, they say that the verdict must be in writing and it be unanimous. And then they were given four verdict forms, two of which required findings of aggravating circumstances beyond a reasonable doubt. Nowhere in the verdict forms was there any requirement for a finding on mitigating circumstances. So they're told that your verdict has to be unanimous, and then they're given verdict forms that only deal with the sentences and aggravating circumstances. Nothing about mitigating circumstances. So they're not being asked to render a verdict on the mitigating circumstance. They're being asked to consider whatever they find to be mitigating. Whatever you, the jury, find to be. And it's certainly nothing like what the court found was fatal in Mills. Right, it was more explicit in Mills, to be sure. In Mills, they had a checklist they had to go down, and they were fairly well explicitly told it had to be unanimous. I think that this court has said that the failure to explicitly say that mitigating circumstances have to be unanimous does not lead to the implication that they must be unanimous. The court said that in Williams v. Anderson, I believe. And so we believe that these instructions don't fall to the same flaws that were in Mills. They are similar to the instructions that the Supreme Court found acceptable in Smith v. Spicek, and that this court affirmed in Cordenbeck v. Scroggie. The district judge did grant a COA on this because he referred to the dissent in Cordenbeck, and some concerns that they raised. But he felt that the instructions were very similar. And this is under Ed Pedefrance. The question is not whether we think it's a good idea, but is there clearly established Supreme Court precedent that would say that this Kentucky court's decision was wrong. And in Kansas v. Carr, just recently, the court has said that there has to be a likelihood that you don't. You can't just assume that because there's ambiguity in the instruction that there's a constitutional error. Under the DEFA standard, the instructions in this case were not fatally flawed. Well, there also was no objection to the jury instructions, were there? There was not that I'm aware of, no. Correct. And the Kentucky Supreme Court reviewed them on their merits. They said there was unpreserved claim of error. So you have the hurdle of plain error, then EPTA on top of that. It was unpreserved, but in Kentucky, in a death penalty case, the court will look past lack of preservation. You'll review it for plain error, right? We certainly do. We review it for plain error unless there is an obvious reason for the lack of preservation. Unless there are any other questions, the warden will be glad to stand on its berth. Okay. Thank you. Burke, you have five minutes for rebuttal. I have a couple of points to make. First, as far as the extraneous information goes, the assistant attorney general cited the court to a definition of extraneous information. It's only if it relates to the, and I'm paraphrasing here, but only if it relates to the defendant or the facts of the case or a witness. And I believe the case is Rendon. I'm losing you. Can you repeat what you just said? I believe the case that was cited to was Rendon, if I'm not mistaken. He cited to Garcia, which cites to it. And I think what's important to point out to the court is that it is true that this court, I'm sorry, it's Herndon, United States v. Herndon. But what's also important to point out in the Garcia case is that this court also, or the panel also discussed Nevers. And in Nevers talked about why, it distinguished it from this case because it was found it was internal deliberation in Nevers. In Garcia, but nevertheless it addressed Nevers, it talked about Nevers. So the idea that Nevers did not qualify as extraneous evidence, and it specifically talked about the Malcolm X movie that the jury was exposed to. So the idea that it's limited to facts or circumstances directly related to the case is simply false. On top of that, this court addressed, in Dicta, but nevertheless talked about the introduction of a bias in the case. And also that clearly has nothing to do with the facts or circumstances of the case. So I don't think there's a limitation there as far as extraneous information goes. Secondly, as far as the Mills v. Maryland issue, the Kentucky Supreme Court never applied the Mills v. Maryland analysis to the, they set it out in the opinion, but they never actually applied that standard. So if we're talking about clearly established law, the law, the Supreme Court law is Mills v. Maryland. And if you look at what the court said, and this is at 147 Southwest 3rd, page 48, they laid out the standard, but the extent of their analysis was this issue was not preserved, however no such instruction was required, and therefore no error occurred. Well, that's not the Mills standard. The Mills standard is whether or not a reasonable juror would have applied the instruction. It's not whether the last state court gave all the right reasons. They did make a determination that it didn't violate the law, the clearly established law, and then we look at that, and if we can give better reasons, we're simply judging did it violate clearly established Supreme Court precedent. We're not grading the argument made by the state court. I think that the Kentucky Supreme Court applied the wrong standard, and that's why it should be de novo reviewed, because they applied a standard of was there a requirement of having a non-unanimous mitigator. And if the answer was no, then there was no error, and that's what they said. So therefore no error occurred, but that isn't the standard. Mills says that the court has to weigh, has to consider the instructions, and then based on those instructions determine whether or not a reasonable juror would have misinterpreted or misapplied the law, which is what occurred here in Thompson. Now, as far as the, and I'm unclear as to what the Commonwealth was referring to when they said, well, it was plain error, so therefore they only looked at plain error. In fact, under capital cases, the Kentucky Supreme Court does not apply just a plain error standard. They actually consider the merits of it, and the only thing they would decide or determine is whether or not if they decide it was not objected to based on trial strategy. And there's no indication that that happened here, and certainly the Kentucky Supreme Court did not indicate that they refused to consider it under an elevated standard. And the reason they do that is because they're capital cases. So the idea that they just applied a plain error standard is false. So Mr. Thompson has two issues here that are somewhat interrelated. He has a jury, a hung jury, that was considering whether or not to sentence him to death, who was exposed and discussed information, extraneous information. And at the same time, they were relying upon jury instructions, which were, would reasonably lead them to misinterpret the law or to apply the law in an unconstitutional manner. Again, that was in a determination of whether or not to sentence Mr. Thompson to death. Both of those things occurred, and consequently, Mr. Thompson was sentenced to death. And this Court, therefore, should grant habeas relief. Thank you.